## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

JIN SIG CHOI,

        Petitioner,

    v.

CHARLES WARREN, et al.,

        Respondents.

Civ. No. 12-3473 (KM)

**OPINION**

**KEVIN MCNULTY, U.S.D.J.**

### I.    INTRODUCTION

The petitioner, Jin Sig Choi, is a state prisoner at the New Jersey State Prison in Trenton, New Jersey. He is proceeding *pro se* with a petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254. Mr. Choi was convicted by a jury in 2005 of murder and felony murder, and is currently serving a sentence of life imprisonment with thirty years of parole ineligibility. He raises multiple claims, including erroneous failure to suppress statements and evidence, inadequate voir dire of jurors, prosecutorial misconduct, and ineffective assistance of counsel. For the following reasons, the habeas petition will be denied.

### II.    FACTUAL AND PROCEDURAL BACKGROUND[1]

> On January 4, 1995, sometime after 11:30 p.m., Usung [Suh] was stabbed eight times with a knife in the attached garage of her home on Mill Run in Paramus, New Jersey. Usung died within ten minutes of the attack.
>
> Usung's husband Michael Suh (Michael) testified that in January 1995, he was living with Usung, his mother-in-law, and his two young children, in Paramus. At the time, Michael owned farmers'

---

[1]    The factual background is taken from the opinion of the Superior Court of New Jersey, Appellate Division, on Mr. Choi's direct appeal, decided February 13, 2007. (*See* Dkt. No. 10-3.)

markets in East Rutherford, Union City, and Hackensack. The markets would generate about $30,000 in cash every day. In the evenings, Michael would bring the cash home and give it to Usung, who managed the money for the businesses. Michael would go in the mornings to the Hunts Point Market in the Bronx, New York, to purchase merchandise with about $30,000 in cash. Michael said that on the night of the robbery and murder, there was about $100,000 in cash in his home.

Michael testified that on the evening of January 4, 1995, after his markets closed, he went to the Union City apartment of a woman with whom he was having a relationship. He left the apartment about 11:00 p.m. and drove home. Michael had in his possession about $20,000 in cash, which he put in a gym bag that he used to carry money. At about 11:30 p.m., Michael arrived home and opened one of the two doors to the garage, using the automatic garage door opener.

Usung's car was parked in the bay on one side of the garage. Michael drove into the garage and activated the device to close the garage door. Usung opened the door from the garage into the kitchen. She waved, turned around, and started to go back into the house. At this point, Michael observed a man with a ski mask in the front of Usung's car. Michael honked the horn to alert Usung to the presence of the intruder.

Michael looked in his rear view mirror and saw another person, who had entered the garage before the garage door had fully closed, and apparently tripped the device causing the door to open again. According to Michael, this individual also was wearing a ski mask. He came up next to Michael's car and tried to open the car door. The door was locked. The intruder pointed a gun at Michael, who leaned away in an effort to protect himself. Michael said that he heard two clicks. The gun did not fire. Michael put his car into reverse and started to back out of the garage.

As he was backing out, Michael saw Usung. She was screaming and trying to get from the garage back into the kitchen. Michael drove away, and made a 9-1-1 call on his cell phone to report the incident to the police. A neighbor who heard noise at the Suh home, and saw someone being attacked by one of the intruders, also alerted the police.

On the road, Michael waved down a police officer who was heading to the Suh home. Michael and the officer drove to his house. Other police officers were already on the scene. When the

police entered the garage, they found Usung's lifeless body, lying on a bicycle. The officers also found two live nine millimeter bullets on the garage floor.

The following morning, a police officer found the knife used in the stabbing on an embankment in Paramus, near Paramus Road, between Midland Avenue and Mill Run. Several weeks later, an individual who was walking her dog found a nine millimeter Smith and Wesson handgun, with a fully loaded magazine on a bicycle path in Ridgewood, New Jersey. The pedestrian turned the weapon over to the Ridgewood police, who removed the magazine and a bullet from the chamber of the gun. The police found another loaded magazine near the spot where the pedestrian found the weapon. Ballistic tests revealed that the bullets found in the garage of the Suh residence had been ejected from the weapon recovered in Ridgewood.

In the weeks that followed, the investigators made inquiries regarding the gun. Their investigation led them to an individual named Pil Jung Kim (Kim) at Hunts Point Market. Kim took the detectives to meet Chung Hoon Park (Park). Park testified that he was defendant's friend, and he had worked with him for about eight months. Park said that in November 1994, he met defendant and Jae Shik Jang (Jang) at a restaurant. Defendant told Park that Jang needed a gun because he had been robbed in the past.

A few weeks later, Park obtained a gun from Kim and sold the gun, two gun clips, and a boxed case of bullets to defendant and Jang for $500. At trial, Park identified the weapon that was sold to defendant and Jang. It was the gun found on the bicycle path in Ridgewood. Park testified that the day after he spoke with the police about the gun, defendant called him twice. Park told defendant that the police were looking for the individual who purchased the weapon. Park told defendant to contact the police. Defendant did not do so.

The investigation focused on defendant and Jang. The investigators learned that Sang Sun Lee (Lee) was Jang's roommate. The investigators spoke with defendant's relatives and learned that defendant's wife owned a white and gray Chevy Blazer. In the following months, the investigators tried to locate defendant, Jang, and Lee. After a story about the case was featured on the "America's Most Wanted television program, the police received a tip that the suspects were in Tacoma, Washington.

The investigators traveled to Washington. At or about this time, Jang turned himself in to the authorities in Missoula, Montana. Jang was brought back to New Jersey. He was charged and later convicted of murder, attempted murder, armed robbery, armed burglary, felony murder, and unlawful possession of a weapon. Jang was sentenced to life in prison, with a forty-year period of parole ineligibility. [FN 1]

> [FN 1]  Jang's conviction and sentences were affirmed on appeal. *State v. Jang*, 359 N.J. Super. 85 (App. Div.), *certif. denied*, 177 N.J. 492 (2003).

In 2003, the investigators learned that defendant was in South Korea. The Office of International Affairs in the United States Department of Justice was contacted and a request was made for defendant's extradition. On January 4, 2004, defendant was arrested in South Korea and in April, 2004, he was returned to the United States in the company of federal law enforcement officers, who transferred custody of defendant at Newark International Airport to Detectives Mark Bendul (Bendul) and Richard Cary. Defendant was transported to the Bergen County Prosecutor's office in Paramus.

There, Bendul informed defendant of his *Miranda* [FN 2] rights, which were set forth on a typed form in the Korean language. Bendul speaks Korean. In that language, Bendul advised defendant of his rights and asked defendant to acknowledge that he understood his rights. Bendul testified that he had defendant read each of the rights out loud. Defendant also read the waiver section of the form and signed it.

> [FN 2] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Defendant gave a statement to Bendul. He stated that he and Jang fled to Tacoma in February 1995 to find Lee. From Tacoma, defendant had traveled to South Korea. Defendant said that he met Michael Suh at Hunts Point Market. He knew that Michael ran a successful produce business, and in the past Michael had hired him to deliver produce to his markets. Defendant also met Jang at Hunts Point Market. Defendant stated that he did not know Lee very well.

Bendul questioned defendant about Usung's murder. Defendant initially denied any involvement, but later asserted that he met Jang and Lee on the evening of January 4, 1995, and Jang told him

he had business to take care of in New Jersey. Jang asked for a ride and defendant drove him in his Chevy Blazer. While crossing the George Washington Bridge, Jang said that they had a job to do, meaning a robbery or burglary. Defendant said that, at Jang's request, he had previously arranged for Park to sell Jang a gun. Defendant stated that he did not know who had obtained the knife. He also did not know where the ski masks had been obtained but Jang and Lee had them.

Defendant, Jang, and Lee arrived at the Suh residence at around 11:00 p.m. Defendant stopped briefly in front of the house and Jang and Lee got out of the car. Defendant said that he turned the vehicle around and parked about fifteen or twenty meters away, with the engine running and the lights out. Jang and Lee went toward the house. Defendant was asked whether anyone had smoked that night. Defendant said that he did not know. [FN 3] According to defendant, Michael arrived at the house around 11:30 p.m. Defendant said that he heard a loud noise. He saw someone leave a car. Defendant said that he left when he heard the loud noise.

> [FN 3] DNA on a cigarette butt found at the crime scene matched the DNA sample provided by defendant.

The jury found defendant guilty on all charges. At sentencing, Judge Conte merged counts two and three with count one, and sentenced defendant to life imprisonment, with a thirty-year period of parole ineligibility. Monetary penalties also were imposed.

(Dkt. No. 10-3 at p. 2-9.) The specific charges of which Mr. Choi was found guilty were one count of murder, N.J. Stat. Ann. § 2C:11-3a(1) and/or (2), and two counts of felony murder, N.J. Stat. Ann. § 2C:11-3(a)(3).

Mr. Choi appealed his judgment and conviction to the Superior Court of New Jersey, Appellate Division. The Appellate Division affirmed the judgment and conviction on February 13, 2007. The New Jersey Supreme Court denied certification on May 3, 2007. *See State v. Choi*, 923 A.2d 230 (N.J. 2007).

In December, 2007, Mr. Choi filed a post-conviction relief ("PCR") petition in the Superior Court of New Jersey, Bergen County. The Superior Court denied the PCR petition in October, 2009. Choi appealed, and on April 28, 2011, the Appellate Division affirmed the denial of the PCR petition. (*See* Dkt. No. 10-8.) The New Jersey Supreme Court denied certification on October 20, 2011. *See State v. Choi*, 29 A.3d 743 (2011).

In June 2012, this Court received Mr. Choi's federal petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. The petition raises several claims:

I.    The Court below erred in denying the motion to suppress statements.

II.    The Court below erred in denying the motion to suppress physical evidence.

III.    Mr. Choi's conviction should be reversed because of prosecutorial misconduct during summation.

IV.    The trial court conducted inadequate voir dire.

V.    The demonstration of the gun being racked and a dummy bullet being ejected was inflammatory.

VI.    Mr. Choi is entitled to an evidentiary hearing to show that he was denied his state and federal constitutional rights to the effective assistance of counsel when his trial attorney failed to advise him of his right to testify at the hearing to suppress a statement and body samples and at trial.

VII.    Mr. Choi is entitled to an evidentiary hearing to show that he was denied his state and federal constitutional rights to the effective assistance of counsel when his trial attorney failed to challenge the state's translation of a letter written by Mr. Choi in Korean.

VIII.    The trial court erred in denying Mr. Choi's petition for PCR without affording him an evidentiary hearing to fully address his contention that he failed to receive adequate legal representation at the trial level as a result of trial counsel's failure to advise him of his right to testify during a suppression hearing as well as at trial.

IX.    The trial court erred in denying Mr. Choi's petition for PCR without affording him an evidentiary hearing to fully address his contention that he failed to receive adequate legal representation at the trial level as a result of counsel's failure to retain an expert to rebut a portion of the State's translation of a letter written by Mr. Choi in Korean.

X.   Neither New Jersey Court Rules 3:22-4 nor 3:22-5 precluded the trial court from adjudicating issues raised in Mr. Choi's PCR petition on their substantive merits.

Respondent was ordered to file an answer to the habeas petition. In addition to arguing that the claims lack merit, respondent's answer asserted that Claims II, III, IV, and V are procedurally defaulted and that Claims II, V, VIII, IX, and X do not raise federal constitutional issues upon which relief can be granted. Mr. Choi filed a traverse in reply.

### III.   HABEAS CORPUS—LEGAL STANDARD

A writ of habeas corpus for a person in custody under judgment of a state court can be granted only for violations of the Constitution, laws or treaties of the United States. *See Engle v. Isaac*, 456 U.S. 107, 119 (1982); *see also Mason v. Myers*, 208 F.3d 414, 415 n.1 (3d Cir. 2000) (citing 28 U.S.C. § 2254). Because Mr. Choi filed his petition for writ of habeas corpus after April 24, 1996, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. 104-132, 110 Stat. 1214 (Apr. 24, 1996), applies. *See Lindh v. Murphy*, 521 U.S. 320, 326 (1997). Under AEDPA, federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:  (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court. *See* 28 U.S.C. § 2254(d).

As a threshold matter, a court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) (quoting 28 U.S.C. § 2254(d)(1)). "'[C]learly established federal law' under § 2254(d)(1) is the governing legal principle set forth by the Supreme Court at the time the state court renders its decision." *Id.* (citations omitted). And, having identified the governing

principle of federal law, a habeas court must also ask whether the state court's application of clearly established federal law was "objectively unreasonable." *See Williams v. Taylor*, 529 U.S. 362, 409 (2000). Thus, "a federal court may not issue a writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411.

The AEDPA standard under § 2254(d) is a "difficult" one to meet; it is a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, —U.S.—, 131 S. Ct. 1388, 1398 (2011). Review under § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Id.* The petitioner has the burden of proof.

In applying AEDPA's standards, the relevant state court decision that is appropriate for federal habeas corpus review is the last reasoned state court decision. *See Bond v. Beard*, 539 F.3d 256, 289-90 (3d Cir. 2008). Furthermore, "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991). AEDPA deference remains appropriate, even as to summary state court rulings; "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 62 U.S. 86, 99 (2011) (citing *Harris v. Reed*, 489 U.S. 255, 265 (1989)).

# IV.   DISCUSSION

A. Claim I – Suppression of Statements

In Claim I, Mr. Choi asserts that the trial court erred in failing to suppress the statements

he made to the police. He points to six alleged errors:  (1) the State did not show that he waived

his rights; (2) the statements were not voluntary; (3) the statements were taken in violation of his

right to counsel; (4) the statements were taken in violation of the Vienna Convention on

Consular Relations; (5) the introduction of the statements violated the Confrontation Clause; and

(6) introduction of the statements was a due process violation. I consider them in order.

1.   *Waiver of Miranda Rights*

Mr. Choi first argues that the State failed to show that he waived his *Miranda* rights. The

last reasoned decision on this argument came on Mr. Choi's direct appeal to the Appellate

Division, which analyzed this claim as follows:

> Defendant first argues that his statements should have been
> suppressed because the State failed to establish that he validly
> waived his *Miranda* rights. We disagree.
>
> The waiver by a suspect of his *Miranda* rights is valid when it is
> made "voluntarily, knowingly and intelligently." *Miranda*, *supra*,
> 384 U.S. at 444, 86 S. Ct. at 1612, 16 L. Ed. 2d at 707. The State
> must prove the validity of a voluntary confession beyond a
> reasonable doubt. *State v. Cook*, 179 N.J. 533, 562 (2004) (citing
> *State v. Galloway*, 133 N.J. 631, 654 (1993)). In making this
> determination, the trial judge must consider the totality of the
> circumstances, "including both the characteristics of the defendant
> and the nature of the interrogation." *Id.* at 563 (quoting *Galloway*,
> *supra*, 133 N.J. at 654).
>
> Here, the record shows that Bendul advised defendant in the
> Korean language of his rights under *Miranda*. Bendul testified that
> he had defendant read the *Miranda* waiver form out loud and
> defendant acknowledged that he understood his rights. Defendant
> also read and signed the *Miranda* waiver form. Based on Bendul's

> testimony, Judge Conte properly determined that defendant had
> made a knowing, intelligent and voluntary waiver of his *Miranda*
> rights.

(Dkt. No. 10-3 at p. 10.)

In *Miranda*, the United States Supreme Court explained that a person questioned by law enforcement after being "taken into custody or otherwise deprived of his freedom of action in any significant way" must first "be warned that he has the right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." 384 U.S. at 444; *see also Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). When the police subject a person in custody to interrogation without warning him or her of those rights, the statements they elicit may not be admitted for certain purposes in a criminal trial. *See Stansbury v. California*, 511 U.S. 318, 322 (1994). A defendant may waive his *Miranda* rights. But that waiver must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

During the suppression hearing, Detective Bendul (who speaks Korean) was asked how he explained the Korean-language *Miranda* form to Mr. Choi:

> I placed the date, time and place in the space provided on top of
> the form and I verbally advised him of his Miranda rights. There
> are five listed on this form. I asked him if he understood each of
> these rights and he replied yes. I then gave him the form and asked
> him to read out loud each one of these rights. He did that. I then
> asked him to write his response of "yes" or "no" after each right.
> He wrote in Korean "yes" after each right.
>
> I asked him to initial his name after that response. He wrote his
> name in English "Choi", his last name, in English next to each
> "yes" response.

> I then took the form back and I verbally advised him of the waiver portion of the Miranda rights form and asked him if he would speak to me regarding this case without the presence of an attorney.
>
> He agreed. I then gave him the form back to him, asked him to fill in the space provided with his name. He wrote his full name in Korean in the space provided in the waiver portion. He then read the waiver portion and again told me that he was willing to speak to me and he signed at the bottom of the form. Detective Breit and I then signed the form as witnesses.

(Dkt. No. 10-11 at p. 27.)

The Appellate Division appropriately cited the applicable legal standard. Its decision that Mr. Choi voluntarily waived his *Miranda* rights was grounded in the factual record, particularly Detective Bendul's testimony. I therefore find that the Appellate Division did not unreasonably apply clearly established federal law or make an unreasonable determination of the facts. This claim does not merit federal habeas relief.

2. *Statements were involuntary*

Mr. Choi next argues that his waiver of his right to remain silent, even if Mirandized, was nevertheless involuntary. He notes that his trip from South Korea to New Jersey was lengthy. He states that he was questioned for over five hours and was confronted with a co-defendant's statement. Those circumstances, he says, establish that his statements to police should have been suppressed.

Again, the last reasoned decision on this claim comes from the Appellate Division on Choi's direct appeal:

> Defendant also argues that the waiver of his *Miranda* rights cannot be considered voluntary because he was subjected to about five hours of questioning after a lengthy flight from Korea, which took approximately twenty-six hours and included stops in Japan and Chicago. However, Bendul testified that defendant said the flight had been "uneventful." Defendant told Bendul that the federal

marshals had been "very kind to him." Defendant also said that he "had food, rest, [and] sleep." Furthermore, at the prosecutor's office in Paramus, the detectives permitted defendant to use the rest room, and they gave defendant water upon his request.

The record fully supports the judge's finding that the police treated defendant "quite well." Moreover, the fact that defendant was questioned for over five hours does not establish that defendant's statements were made involuntarily. *See State v. Knight*, 183 N.J. 449, 469 (2005) (noting that "the length of the interrogation alone is insufficient reason to invalidate defendant's confession").

(Dkt. No. 10-3 at p. 11-12.)

The United States Supreme Court has explained that a valid *Miranda* waiver has two

dimensions:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran*, 475 U.S. at 421. "A statement is given voluntarily if, when viewed in the totality of the

circumstances, it is the product of an essentially free and unconstrained choice by its maker."

*United States v. Jacobs*, 431 F.3d 99, 108 (3d Cir. 2005) (citing *Schneckloth v. Bustamonte*, 412

U.S. 218, 225 (1973)); *United States v. Swint*, 15 F.3d 286, 289 (3d Cir. 1994).

> If an individual's will is overborne or that person's capacity for self-determination is critically impaired, her or his statements are involuntary. *Schneckloth*, 412 U.S. at 225-26, 93 S. Ct. 2041. A suspect's background and experience, including prior dealings with the criminal justice system should be taken into account in the voluntariness inquiry. *See Oregon v. Bradshaw*, 462 U.S. 1039, 1046, 103 S. Ct. 2830, 77 L. Ed. 2d 405 (1983) (plurality); *United Staets v. Velasquez*, 885 F.2d 1076, 1086 (3d Cir. 1989). A necessary prerequisite to a finding of involuntariness is coercive police activity. [*Colorado v.*] *Connolly*, 479 U.S. [157,] 167, 107

12

S. Ct. 515 [(1986)]. Further, there must be some causal connection between the police conduct and the confession. *Id.* at 164, 107 S. Ct. 515.

*Jacobs*, 431 F.3d at 108. The voluntariness of a confession is judged based on such factors as coercive conduct, the length, location and continuity of the interrogation, the defendant's maturity and education, and the defendant's physical and mental health. *See United States v. Andrews*, 231 F. App'x 174, 176 (3d Cir. 2007) (citing *Swint*, 15 F.3d at 289); *Pierce v. Dow*, No. 11-3965, 2013 WL 6027928, at *15 (D.N.J. Nov. 13, 2013).

I find that the Appellate Division did not unreasonably apply clearly established federal law. Neither was its denial of this claim based on an unreasonable determination of the facts. The Appellate Division appropriately cited the applicable legal standard. It examined the totality of the circumstances surrounding petitioner's interrogation, which is the proper approach under federal law. *See Moran*, 475 U.S. at 421. Its decision that Mr. Choi voluntarily waived his *Miranda* rights was grounded in the factual record, particularly Detective Bendul's testimony. While Mr. Choi had traveled a long way, he had been fed and rested while on the plane. He was given bathroom breaks and water. The five-hour interrogation was not coercively conducted or unduly lengthy.[2]

This claim does not warrant federal habeas relief.

---

[2]    *State v. Knight, supra,* the New Jersey case cited by the Appellate Division, was itself an application of *Miranda,* and it is generally in accord with federal cases applying the *Miranda* totality-of-the-circumstances test. *See, e.g., Castro v. Folino,* No. 10-2568, 2014 WL 56882, at *9 (E.D. Pa. Jan. 7, 2014) (state court finding that petitioner's confession was voluntary was in accordance with clearly established federal law where he was given food and drink, opportunities to smoke and to use the bathroom over four hour period of questioning); *Kirk v. Carroll,* 243 F. Supp. 2d 125, 135 (D. Del. Jan. 30, 2003) (finding petitioner is not entitled to federal habeas relief despite interview lasting over five hours where petitioner was given bathroom breaks and privileges such as cigarettes and soda); *United States v. Zhang,* Crim. No. 98-0425, 1999 WL 61416, at *9 (D.N.J. Feb. 8, 1999) (decision of defendant to answer questions during four hour interrogation was voluntary as interview was punctuated by breaks and defendant pointed to nothing unusual or coercive in the environment, police tactics or circumstances).

3. *Statements Taken in Violation of Right to Counsel*

Petitioner next argues that his post-arrest statement was taken in violation of his right to counsel. He asserts that his right to counsel attached prior to the questioning because he had already been indicted on a federal charge of being an illegal alien in possession of a firearm, and also because he was subject to an arrest warrant.

Again, the last reasoned decision on this claim comes from the Appellate Division on Choi's direct appeal:

> Defendant additionally contends that his statements should have been suppressed because they were taken in violation of his right to counsel. The record shows that, before he was questioned by the Bergen County investigators regarding the robbery and murder at issue here, defendant was charged under a federal indictment for the unlawful possession of a weapon by an illegal alien. The federal charge was based on defendant's possession of the weapon used in the robbery.[4] However, at the time he was questioned, defendant had not been indicted for the robbery and murder. Defendant argues that, in the circumstances, he could not be questioned on these matters without the consent of his attorney. Again, we disagree.
>
> > [FN 4] Defendant also was facing charges in Monmouth County. Those charges were apparently unrelated to the charges at issue here.
>
> The right to counsel under the Sixth Amendment to the United States Constitution does not attach until "adversary judicial criminal proceedings" are commenced "whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *United States v. Gouveia,* 467 U.S. 180, 188, 104 S. Ct. 2292, 2297, 81 L. Ed. 2d 146, 154, (1984) (quoting *Kirby v. Illinois,* 406 U.S. 682, 688-89, 92 S. Ct. 1877, 1881-82, 32 L. Ed. 2d 411, 417, (1972)). Applying the right to counsel under the New Jersey Constitution, our Supreme Court has held that, "after an indictment and before arraignment, prosecutors or their representatives should not initiate a conversation with [a defendant] without the consent of defense counsel." *State v. Sanchez,* 129 N.J. 261, 277 (1992).

In *McNeil v. Wisconsin,* 501 U.S. 171, 175, 111 S. Ct. 2204, 2207, 115 L. Ed. 2d 158, 166 (1991), the Court held that the right to counsel under the United States Constitution is "offense specific" and "cannot be invoked once for all future prosecutions." Thereafter, in *State v. Tucker,* 137 N.J. 259 (1994), *cert. denied,* 513 U.S. 1090, 115 S. Ct. 751, 130 L. Ed. 2d 651 (1995), the Court held that, if an "offense under investigation is based on essentially the same factual context as the charged offense, assertion of the Sixth Amendment right to counsel on the charged offense should bar police-initiated interrogation on the related offense." *Id.* at 278. The decision in *Tucker* was based on opinions in certain federal and state cases, which held that for Sixth Amendment purposes, the right to counsel applied when a defendant was questioned on a matter "inextricably intertwined" to the charged offense. *Id.* at 277-78 (citing, among other cases, *United States v. Kidd,* 12 F.3d 30, 33 (4th Cir.1993), and *United States v. Hines,* 963 F .2d 255, 257 (9th Cir.1992)).

However, after *Tucker* was decided, the Court in *Texas v. Cobb,* 532 U.S. 162, 164, 121 S. Ct. 1335, 1339, 149 L. Ed. 2d 321, 326 (2001), reiterated that the right to counsel under the Sixth Amendment is "offense specific." The Court rejected the view that the right to counsel on a charged offense extends to related matters. In *State v. Harris,* 181 N.J. 391, 435 (2004), *cert. denied,* 545 *U.S.* 1145, 125 S. Ct. 2973, 162 L. Ed. 2d 898 (2005), our Supreme Court acknowledged this interpretation of the Sixth Amendment.

The decisions in *McNeil, Cobb* and *Harris* therefore make clear that, because defendant had not yet been indicted for the robbery and murder at the Suh residence, the right to counsel had not attached when defendant was questioned by the Bergen County detectives about these matters. Consequently, the consent of counsel was not required before defendant was questioned concerning those offenses.

(Dkt. No. 10-3 at p. 12-14.)

The state court's denial of this claim was not an unreasonable application of clearly established federal law. The Appellate Division appropriately cited federal authority to the effect that the Sixth Amendment is "offense specific. It cannot be invoked once for all future prosecutions, for it does not attach until a prosecution is commenced, that is, 'at or after the initiation of adversary judicial criminal proceedings – whether by way of formal charge,

15

preliminary hearing, indictment, information, or arraignment.'" *McNeil v. Wisconsin*, 501 U.S.

171, 175 (1991) (quoting *United States v. Gouveia*, 467 U.S. 180, 188 (1984) (quoting *Kirby v.*

*Illinois*, 406 U.S. 682, 689 (1972) (plurality opinion))); *see also Anderson v. Alameida*, 397 F.3d

1175, 1180-81 (9th Cir. 2005) (no right to counsel attaches at arrest); *Von Kahl v. United States*,

242 F.3d 783, 789 (8th Cir. 2001) (issuance of arrest warrant does not constitute the initiation of

an adverse judicial proceeding for purposes of *McNeil*) (citation omitted). Once the Sixth

Amendment right to counsel attaches, it encompasses the charged offense and "offenses that,

even if not formally charged, would be considered the same offense under the *Blockburger* test."

*Texas v. Cobb*, 532 U.S. 162, 173 (2001). The *Blockburger* test of separate offenses asks

"whether each provision requires proof of a fact which the other one does not." *Blockburger v.*

*United States*, 284 U.S. 299, 304 (1932); *see also United States v. Berryman*, 322 F. App'x 216,

224 (3d Cir. 2009) ("Two charges are 'the same' if . . . they punish 'the same act or transaction'

and if all of one are also elements of the other."). In applying *Blockburger*, "a court looks to the

statutory elements of the crime charged to determine if there is any overlap." *United States v.*

*Rigas*, 605 F.3d 194, 204 (3d Cir. 2010) (quoting *United States v. Chorin*, 322 F.3d 274, 281 (3d

Cir. 2003)). Thus, the Supreme Court explained in *Cobb*, "we could just as easily describe the

Sixth Amendment as 'prosecution specific,' insofar as it prevents discussion of charged offenses

as well as offenses that, under *Blockburger*, could not be the subject of a later prosecution. And,

indeed, the text of the Sixth Amendment confines its scope to 'all criminal *prosecutions*.'" 532

U.S. at 173 n.3 (emphasis in original).

The state court, having cited the appropriate federal standard, did not unreasonably apply

it to the facts of Choi's case. At the time of Choi's statement, he had been charged federally with

being an illegal alien in possession of a firearm. He had not yet been charged with felony murder

or murder. The filing of the firearms charge did not cause Choi's right to counsel to attach as to the murder charges, because the two sets of charges did not meet the *Blockburger* test of identity: that is, they did not have the same elements. Under New Jersey law, murder does not require that petitioner be an illegal alien (and may be committed by means other than a firearm).[3]

---

[3]     The basic definition of criminal homicide under New Jersey law is as follows:

"a. A person is guilty of criminal homicide if he purposely, knowingly, recklessly or, under the circumstances set forth in section 2C:11-5, causes the death of another human being.

b. Criminal homicide is murder, manslaughter or death by auto."

N.J. Stat. Ann. § 2C:11-2.

The New Jersey statute under which Mr. Choi was convicted of murder provides, with irrelevant exceptions,

"… criminal homicide constitutes murder when:

(1) The actor purposely causes death or serious bodily injury resulting in death; or

(2) The actor knowingly causes death or serious bodily injury resulting in death…."

N.J. Stat. Ann. § 2C:11-3(a).

The New Jersey statute under which Mr. Choi was convicted of felony murder provides:

(3)  It is committed when the actor, acting either alone or with one or more other persons, is engaged in the commission of, or an attempt to commit, or flight after committing or attempting to commit robbery, sexual assault, arson, burglary, kidnapping, carjacking, criminal escape or terrorism pursuant to section 2 of P.L.2002, c.26 (C.2C:38-2), and in the course of such crime or of immediate flight therefrom, any person causes the death of a person other than one of the participants; except that in any prosecution under this subsection, in which the defendant was not the only participant in the underlying crime, it is an affirmative defense that the defendant:

(a) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and

(b) Was not armed with a deadly weapon, or any instrument, article or substance readily capable of causing death or serious physical injury and of a sort not ordinarily carried in public places by law-abiding persons; and

(c) Had no reasonable ground to believe that any other participant was armed with such a weapon, instrument, article or substance; and

(d) Had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury.

N.J. Stat. Ann. § 2C:11-3(a)(3).

Conversely, under federal law, illegal possession of a firearm by an alien does not require that anyone be bodily harmed or killed, or even that the firearm be used at all.[4]

The filing of federal firearms charges did not cause the attachment of petitioner's right to counsel as to the state murder charges. Accordingly, this claim does not warrant granting federal habeas relief.

4. *Vienna Convention*

Mr. Choi next argues that his statement was taken by the police in violation of the Vienna Convention. He claims that, had he been informed of his right to contact the South Korean consulate, counsel could have been appointed.

Again, the last reasoned decision on this claim occurred on Mr. Choi's direct appeal of his conviction to the Appellate Division:

> Defendant further asserts that his statements were taken in violation of his rights under the Vienna Convention on Consular Relations and Optional Protocol on Disputes (VCCR). "The VCCR is a binding multi-lateral treaty to which over 160 nations are parties." *Jang, supra,* 359 N.J. Super. at 91. The VCCR provides, among other things, that when requested to do so, "competent authorities of the receiving State shall ... inform the consular post of the sending State [when] a national of [the sending] State is

---

[4] The federal statute under which Mr. Choi was charged with the firearms offense provides:

"(g) It shall be unlawful for any person—

...

(5) who, being an alien—

    (A) is illegally or unlawfully in the United States; or

    (B) except as provided in subsection (y)(2), has been admitted to the United States under a nonimmigrant visa (as that term is defined in section 101(a)(26) of the Immigration and Nationality Act (8 U.S.C. 1101 (a)(26)));

...

to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."

18 U.S.C. § 922(g).

> arrested or committed to prison or to custody pending trial or is
> detained in any other manner." *Id.* at 92 (quoting the VCCR, art.
> 36(1)(b), Apr. 24, 1963, 21 U.S.T. 77, 596 U.N.T.S. 261).
>
> Here, the VCCR did not require the State to provide notice to
> South Korea that defendant had been arrested and taken into
> custody. Defendant was arrested in South Korea and his extradition
> to the United States was arranged with the cooperation of the
> South Korean Government. The Government of South Korea
> therefore was on notice that defendant would be arrested, taken
> into custody, and detained for trial after his extradition to the
> United States. In the circumstances, the VCCR did not require the
> State to provide notice to the South Korean consulate.

(Dkt. No. 10-3 at p. 15-16.)

This was not a case of a foreign national's being found and arrested within the United

States. Mr. Choi was extradited from South Korea. South Korea was clearly on notice of Mr.

Choi's arrest and extradition; it occurred within that nation's borders, and with its consent,

pursuant to the proper procedures. Accordingly, petitioner's Vienna Convention claim lacks

merit. *See United States v. Banks*, 464 F.3d 184, 191 (2d Cir. 2006) (rejecting Vienna

Convention claim where Dominican Republic arrested defendant before transferring him to the

United States such that defendant "cannot reasonably contend that the Dominican Republic was

not aware of his arrest and detention").

Mr. Choi fails to show that he is entitled to any relief on this claim; *a fortiori* he cannot

show that the state court's decision unreasonably applied clearly established federal law.

5. *Confrontation Clause*

Mr. Choi next asserts that the introduction of his statements in evidence violated the

Confrontation Clause. According to Mr. Choi, he "was prevented from adequately cross

examining the detective at trial regarding the circumstances that led to Mr. Choi making the

inculpatory statement because to do so would have elicited Jang's declarations, which were not

going to be subjected to cross examination before the jury." (Dkt. No. 1 at p. 10.)

Again, the last reasoned decision on this claim was that of the Appellate Division on

Choi's direct appeal:

> Defendant next argues that the State should not have been
> permitted to introduce his statements into evidence because, when
> he was questioned, the detectives informed him of what Jang had
> said about the robbery and murder. Defendant argues that the
> introduction of his statements responding to Jang's assertions
> violated his right to confrontation under the Sixth Amendment to
> the United States Constitution, and Article 1, Paragraph 10 of the
> New Jersey Constitution. The argument is entirely without merit.
> Although Bendul testified at trial about what defendant said during
> the interrogation, Jang's statements were never introduced into
> evidence. Defendant's right to confrontation was not implicated in
> any way.

(Dkt. No. 10-3 at p. 16.)

The Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall

enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI.

"The main and essential purpose of confrontation is to secure for the opponent the opportunity of

cross-examination." *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986). In *Crawford v.*

*Washington*, the Supreme Court held that the Confrontation Clause bars "admission of

testimonial statements of a witness who did not appear at trial unless he was unavailable to

testify, and the defendant had had a prior opportunity for cross-examination." *Id.* at 53-54.

As found by the Appellate Division, Mr. Choi's right to confrontation was not implicated

in any way. Choi asserts that the police used Jang's statement during his interrogation. Jang's

statements were not, however, introduced in evidence against him at trial. The implication seems

to be that because the *police* confronted Choi with Jang's out-of-court statements, introduction of

Choi's confession somehow conveyed Jang's statements to the jury. The record will not support any such inference; the jury never heard Jang's out of court statements.

There is no Confrontation Clause issue, and the state court did not unreasonably apply clearly established federal law. Accordingly, Mr. Choi is not entitled to federal habeas relief on this claim.

6. *Due Process*

Mr. Choi also argues that the introduction of his post-arrest statements violated due process standards, because (a) only a two minute snippet of his five hour interrogation was tape recorded; and (b) the detective discarded his handwritten notes of the interrogation.

i.    Failure to electronically record interrogation

The Appellate Division, on direct appeal, analyzed this claim as follows:

> Defendant also contends that he was denied due process because the detectives made a recording of only about two minutes of the interrogation. Contrary to defendant's contention, due process does not require the electronic recording of an interrogation. [citing *State v. Cook*, 179 N.J. 533, 560 (2004)].

(Dkt. No. 10-3 at p. 16.)

The state court decision cited only state law. Federal law, however, is not to the contrary. There is no clearly established precedent of the Supreme Court of the United States holding that interrogations must be recorded. Lower federal court decisions interpreting the Constitution hold that there is no such requirement. *See Reinert v. Larkins*, 379 F.3d 76, 94 n.4 (3d Cir. 2004) (no federal right to have custodial interrogation recorded); *Allen v. Lewis*, No. 11-4441, 2013 WL 6512475, at *4 (N.D. Cal. Dec. 12, 2013) ("Due process . . . does not require electronic recording of interrogations.") (citing *United States v. Smith-Baltiher*, 424 F.3d 913, 925-26 (9th Cir. 2005)); *Linnen v. Poole*, 766 F. Supp. 2d 427, 454 (W.D.N.Y. 2011) (collecting cases holding

that federal Constitution does not obligate police officers to record interrogations or confessions).

The state court's denial of this claim was not an unreasonable application of clearly established federal law.

  ii.  Destruction of notes of interrogation

Mr. Choi also claims that his due process rights were violated because Detective Bendul took notes on yellow lined paper, but subsequently destroyed the notes. According to Choi, Bendul admitted that not everything he made notes of made it into his report. The Appellate Division, on direct appeal, analyzed this claim as follows:

> Defendant further argues that his right to due process was denied because Bendul discarded the notes he made during the interrogation. The Supreme Court has noted its disapproval of the apparently common practice by the police to discard such notes. [citing *State v. Cook*, 179 N.J. 533, 542 n.3 (2004)] *See also State v. Branch,* 182 N.J. 338, 367 n. 10 (2005) (registering "displeasure" with the disposal of notes of witness interviews after the police have prepared their formal reports). However, a police officer's failure to retain notes of an interrogation does not warrant reversal of a conviction when, as in this case, the detective has provided detailed testimony concerning the interrogation, which establishes that defendant made his statements knowingly, intelligently and voluntarily.

(Dkt. No. 10-3 at p. 17.)

I have found no Supreme Court case law clearly establishing that the due process clause is violated by an officer's failure to preserve notes of interviews. That alone should dispose of the claim. I nevertheless consider less direct sources for such a claim.

A due process violation under *Brady v. Maryland*, 373 U.S. 83 (1963), "occurs if: (1) the evidence at issue is favorable to the accused, because either it is exculpatory or impeaching; (2) the prosecution withheld it; and (3) the defendant was prejudiced because the evidence was

'material.'" *Breakiron v. Horn*, 642 F.3d 126, 133 (3d Cir. 2011) (citations omitted). Materiality

requires "a reasonable probability that, if the evidence had been disclosed, the result of the

proceeding would have been different." *Id.* (citing *Giglio v. United States*, 405 U.S. 150, 154

(1972)). Here, however, *Brady* does not apply. Because the notes had been destroyed, the

prosecution cannot have wrongfully withheld them. Nor is there any showing that the notes

contained anything materially exculpatory.[5]

     Alternatively, Mr. Choi's claim might be viewed under the Supreme Court's analysis of

alleged spoliation of evidence:

> [Although *Brady, supra*] makes the good or bad faith of the State irrelevant when
> [it] fails to disclose to the defendant material exculpatory evidence, the due
> process clause requires a different result when we deal with the failure of the State
> to preserve evidentiary material of which no more can be said than that it could
> have been subjected to tests, the results of which might have exonerated the
> defendant …. [U]nless a criminal defendant can show bad faith on the part of the
> police, failure to preserve potentially useful evidence does not constitute a denial
> of due process of law.

*Arizona v. Youngblood*, 488 U.S. 51, 57-58 (1988).

     Mr. Choi makes no argument or proffer as to what in the officer's notes might have

differed from the officer's detailed trial testimony regarding his post-arrest statement. *A fortiori*,

he makes no proffer that anything in the notes could or would have helped his defense at trial.

Nor does he show that the officer acted in bad faith when he failed to preserve the notes.

     There is no showing that the state court unreasonably applied clearly established federal

law in finding that the absence of the notes did not prevent Choi from receiving a fair trial.

Accordingly, this claim will be denied.

---

[5]     In an abundance of caution, I point out that the United States Court of Appeals for the Third
Circuit has held that rough notes should be preserved so that they can be reviewed for exculpatory Brady
material. *See United States v. Vella*, 562 F.2d 275, 276 (3d Cir. 1975). The Supreme Court, however, has
not adopted that rule. *Vella,* at any rate, might best be viewed as a prophylactic safeguard, rather than as a
font of due process law in its own right.

B.  Claim II – Suppression of Physical Evidence

In Claim II, Mr. Choi asserts that the trial court erred in denying his motion to suppress DNA evidence that was seized from him. He claims that, because his right to counsel had attached, his consent to give DNA samples was not knowing and voluntary.

Respondent asserts that this claim is procedurally defaulted because Mr. Choi did not raise it in his petition for certification to the New Jersey Supreme Court. Alternatively, respondent claims that this Court can deny this claim on the merits.

I will pass over the exhaustion/default issue and address this claim on the merits. True, "the better practice allows a New Jersey court – not a federal court – the first opportunity to address the question of procedural default under New Jersey law." *Toulson v. Beyer*, 987 F.2d 984, 988 n.7 (3d Cir. 1993)); *see also Baker v. Ricci*, No. 09-3654, 2013 WL 4833415, at *10-11 (D.N.J. Sept. 9, 2013). But "a federal court [may] deny an unexhausted claim on the merits 'if it is perfectly clear that the applicant does not raise even a colorable federal claim.'" *Carpenter v. Vaughn*, 296 F.3d 138, 146 (3d Cir. 2002) (quoting *Lambert v. Blackwell*, 134 F.3d 506, 515-15 (3d Cir. 1997) (construing 28 U.S.C. § 2254(b)(2))). *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

Mr. Choi fails to make a colorable federal claim with respect to this issue. As explained in Part IV.A.3, *supra*, Mr. Choi's right to counsel (with respect to these murder charges) had not attached at the time of his interrogation, which is also when he consented to give the DNA sample. He is not entitled to federal habeas relief on this claim.

C. Claim III – Prosecutorial Misconduct

In Claim III, Mr. Choi argues that his conviction should be reversed based on prosecutorial misconduct during summation. According to Mr. Choi, the prosecutor committed several errors, "including commenting on Mr. Choi's right to remain silent, shifting the burden, denigrating the defense, invoking religion, calling for speculation, and misstating the law." (Dkt. No. 1 at p. 13.) As with Claim II, respondent argues that this claim is procedurally defaulted because Mr. Choi did not raise it in his petition for certification to the New Jersey Supreme Court on direct appeal, and also argues that it can be denied on the merits. For similar reasons, I will bypass the exhaustion/default issue and proceed to the merits, which are plainly lacking.

A criminal defendant's due process rights are violated if prosecutorial misconduct renders a trial fundamentally unfair. *See Darden v. Wainwright,* 477 U.S. 168, 182–83 (1986). A habeas petition will be granted for prosecutorial misconduct only when the misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* at 181 (internal quotation marks and citation omitted). A prosecutorial misconduct claim is examined in "light of the record as a whole" in order to determine whether the conduct "had a substantial and injurious effect or influence" on the jury's verdict. *See Brecht,* 507 U.S. at 638. A "reviewing court must examine the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant." *Moore v. Morton,* 255 F.3d 95, 107 (3d Cir. 2001).[6] Here, Mr. Choi has failed to raise a colorable prosecutorial misconduct claim.

Mr. Choi's claim that the prosecutor impermissibly invoked religion in his summation is not substantial. In reference to the safety feature on the Suh garage door, Edith Ciampo's

---

[6]     The Appellate Division cited only state court cases. (Dkt. No. 10-3 at p. 18) Their requirements, however, parallel those of the federal cases cited in text, above.

discovery of the gun, and the engagement of the safety catch on the gun, the prosecutor used the expression "thank God." (*See* Dkt. No. 10-1 at p. 62-63.) Common sense suggests that this is a routine figure of speech, not an attempt to invoke the jurors' religious beliefs or awaken sectarian prejudices. *See Galberth v. Standifird*, No. 11-0795, 2012 WL 393639, at *8 (W.D. Okla. Jan. 17, 2012) (prosecutor thanking God did not amount to prosecutorial misconduct as it was a figure of speech as opposed to an attempt to convey a religious doctrine to the jury); *Sechrest v. Baker*, 816 F. Supp. 2d 1017, 1055 (D. Nev. 2011) (comments of prosecutor of "thank the Good Lord," "by God," and "out of the mouths of babes" were figures of speech and did not convey any religious meaning nor summon religious authority for his position such that they did not constitute unconstitutional prosecutorial misconduct).

The remaining summation issues are likewise insubstantial. Mr. Choi's criticisms of the summation may fairly be characterized as a list of quibbles. In any event, however, these alleged misstatements could not have had a substantial and injurious effect on the jury's verdict.

First, the jury was specifically instructed that:

> Regardless of what counsel may have said in recalling the evidence in this case, it is your recollection of the evidence that should control you and guide you as judges of the facts. Arguments, statements, remarks, openings and summations of counsel are not evidence and must not be treated as evidence by you.
> Although the attorneys may have pointed out what they thought important in this case, you must rely solely upon your understanding and recollection of the evidence that was admitted during the trial.

(Dkt. No. 10-21 at p. 34.) Indeed, the jury was instructed that the comments of the attorneys were not law and that evidence is the testimony they have heard from the witness stand and the exhibits that are marked into evidence. (*See* Dkt. No. 10-21 at p. 7.) Further, the jury was instructed that any statements by the attorneys about the content of the law must be disregarded

by the jury if they conflict with the judge's charge. (*See id.* at p. 6-7.) The jury was instructed

that the burden of proving each element of the charge beyond a reasonable doubt is with the

State and never shifts to the defendant. (*See id.* at p. 33.) The judge further defined to the jury

what constitutes reasonable doubt. (*See id.*) Finally, the judge instructed the jury that "[i]t is not

the duty or the obligation of a defendant in a criminal case to prove his innocence or to offer any

proof relating to his innocence." (*Id.*) The jury was also instructed that Mr. Choi has a

constitutional right to remain silent and that they "must not consider for any purpose or in any

manner in arriving at [their] verdict the fact that Mr. Choi did not testify." (Dkt. No. 10-22 at p.

5.) The jury is presumed to have followed these instructions. *See, e.g., Weeks v. Angelone*, 528

U.S. 225, 234 (2000).

Prejudice, moreover, is lacking. This was not a weak case. The evidence included Mr.

Choi's statements to police about his knowledge and actions on the night of the murder, in which

he admitted that the other culprits were carrying weapons and intended to do a robbery. A

vehicle matching Mr. Choi's Chevy Blazer was spotted at the crime scene. The evidence

produced at trial included Mr. Choi's DNA, which was found on a cigarette near the crime scene.

Setting aside any failure to exhaust state remedies, Mr. Choi is not entitled to federal

habeas relief on this claim of prosecutorial misconduct in summation because he has failed to

raise a colorable argument.

D.   Claim IV – Inadequate Voir Dire

In Claim IV, Mr. Choi argues that the trial court conducted inadequate voir dire of

prospective jurors. Choi states that his case once appeared on the "America's Most Wanted"

television program, and that it would have been helpful to know if the prospective jurors had

seen it. Respondent claims that this claim is procedurally defaulted because Choi did not raise it

27

in his petition for certification to the New Jersey Supreme Court on direct appeal. For the reason

stated above, I will bypass the exhaustion/default issue and address the merits.

In denying this claim on direct appeal, the Appellate Division stated as follows:

> Defendant next contends that the trial judge did not conduct an
> adequate *voir dire* of the potential jurors. Defendant maintains that
> the judge erred because he did not question the prospective jurors
> about the television programs that they watch or materials that they
> read. Defendant asserts that this was "especially problematic"
> because Usung's murder was featured on the "America's Most
> Wanted" television program.
>
> We are satisfied, however, that the judge's *voir dire* in this matter
> was thorough and the omitted questions did not prevent the
> selection of a fair and impartial jury. The offenses at issue here
> occurred more than ten years before defendant's trial. The
> "America's Most Wanted" program about this case was broadcast
> about nine years prior to the trial. Moreover, the trial judge asked
> whether any potential juror had read about the case or heard about
> it on television. The judge also asked the potential jurors whether
> there was any reason why they could not serve on the jury. We
> must assume that the prospective jurors would have informed the
> judge if they had seen a television program about this matter.

(Dkt. No. 10-3 at p. 19-20).

The Fourteenth Amendment guarantees each criminal defendant the right to a trial by an

impartial jury free of outside influences. *See Sheppard v. Maxwell*, 384 U.S. 333, 362 (1966).

When a defendant challenges voir dire procedures, the issue is whether the trial court's failure to

ask the potential jurors a particular question rendered the trial fundamentally unfair. *See Mu'Min

v. Virignia*, 500 U.S. 415, 426 (1991). As one court has noted:

> Prejudice can be presumptive or actual. *Foley,* 488 F.3d at 387.
> "Presumptive prejudice from pretrial publicity occurs where an
> inflammatory, circus-like atmosphere pervades both the courthouse
> and the surrounding community" and "is rarely presumed." *Id.* In
> the absence of presumed prejudice, "the trial court has a
> responsibility to confront the fact of the publicity and determine if
> the publicity rises to the level of 'actual prejudice.'" *Ritchie v.
> Rogers,* 313 F.3d 948, 962 (6th Cir.2002). "[A] searching voir dire

> of the prospective jurors is the primary tool to determine if the
> impact of the publicity rises to th[e] level" of actual prejudice. *Id.*
> At *voir dire,* the court must examine the jurors' statements to
> determine if there is a community-wide sentiment against the
> defendant; however, "[n]egative media coverage by itself is
> insufficient to establish actual prejudice." *Foley,* 488 F.3d at 387.
> When evaluating jurors, "mere prior knowledge of the existence of
> the case, or familiarity with the issues involved, or even some
> preexisting opinion as to the merits, does not in and of itself raise a
> presumption of jury taint...." *DeLisle v. Rivers,* 161 F.3d 370, 382
> (6th Cir.1998). Rather, "[t]he relevant question is 'did [the] juror
> swear that he could set aside any opinion he might hold and decide
> the case on the evidence, and should the juror's protestation of
> impartiality have been believed.' " *Foley,* 488 F.3d at 387 (second
> alteration in original) (quoting *Patton v. Yount,* 467 U.S. 1025,
> 1036, 104 S. Ct. 2885, 81 L. Ed. 2d 847 (1984)). If a biased juror
> was seated who should have been dismissed for cause, we must
> reverse the conviction. *Hughes v. United States,* 258 F.3d 453, 463
> (6th Cir.2001).

*Campbell v. Bradshaw,* 674 F.3d 578, 593-94 (6th Cir. 2012). Furthermore, as the United States

Supreme Court has noted, wide discretion is:

> granted to the trial court in conducting *voir dire* in the area of
> pretrial publicity and in other areas of inquiry that might tend to
> show juror bias. Particularly with respect to pretrial publicity, we
> think this primary reliance on the judgment of the trial court makes
> good sense. The judge of that court sits in the local where the
> publicity is said to have had its effect and brings to his evaluation
> of any such claim his own perception of the depth and extent of
> news stories that might influence a juror. The trial court, of course,
> does not impute his own perceptions to the jurors who are being
> examined, but these perceptions should be of assistance to it in
> deciding how detailed an inquiry to make of the members of the
> jury venire.

*Mu'Min,* 500 U.S. at 426.

Prejudice is not presumed here; Mr. Choi must demonstrate actual prejudice. His claim,

boiled down, is that it was not enough to ask the jurors whether they had seen anything about the

case "on television"; due process, he contends, required the trial judge to invoke a nine-year-old

"America's Most Wanted" episode by name. Needless to say, there is no United States Supreme Court case that clearly and definitively creates such an obligation.

Mr. Choi does not present a colorable claim as to this fairly discretionary matter. The trial judge asked the prospective jurors whether they had heard anything about this case in the newspapers or on television. (*See* Dkt. No. 10-13 at p. 20.) Such a question adequately addresses Mr. Choi's underlying concern about exposure to pretrial publicity. And memories were indeed jogged by voir dire; a few prospective jurors indicated that they had previously heard about this case. (*See id.* at p. 29, 32, 39.) The voir dire was adequate to uncover prior exposure to the case, through America's Most Wanted or otherwise, and it did not result in an unfair trial.

This habeas claim will be denied.

E.   Claim V – Demonstration of Gun Being Racked and Dummy Bullet Being Ejected was Inflammatory

In Claim V, Mr. Choi argues that the trial court erred in permitting a ballistics expert to demonstrate the gun being racked and a dummy bullet being ejected. The demonstration, he says, unfairly prejudiced the jury.

Once again, respondent points out that the claim is unexhausted and procedurally defaulted because Mr. Choi failed to include it in his petition for certification to the New Jersey Supreme Court on direct appeal. Once again, I bypass exhaustion issues and examine the merits. And once again, I find that Mr. Choi has failed to state a colorable claim.

On direct appeal, the Appellate Division analyzed this claim as follows:

> Defendant further contends that the judge erred by allowing the State to present a demonstration of how the bullets found in the garage were ejected from the gun. Defendant asserts that the demonstration was inflammatory. We disagree.
>
> As we stated previously, after the robbery and murder, the police found two bullets on the floor of the Suh garage. Michael testified

> that one of the two intruders aimed a gun at him and he heard two
> clicking sounds. The demonstration was intended to show the
> jurors how the bullets could be ejected from the weapon, and to
> allow them to hear the sounds that would accompany the ejection
> of the bullets. There was nothing inflammatory about the
> demonstration. In our view, the judge did not abuse his discretion
> by allowing the introduction of this demonstrative evidence.

(Dkt. No. 10-3 at p. 20.)

An erroneous evidentiary ruling is not itself grounds for habeas relief. To rise to the level

of a constitutional violation, a state court's evidentiary decision must have been so arbitrary or

prejudicial that it rendered the trial fundamentally unfair, thereby violating a petitioner's due

process rights. *See Romano v. Oklahoma,* 512 U.S. 1, 12–13, 114 S. Ct. 2004, 129 L. Ed. 2d 1

(1994); *see also Keller v. Larkins,* 251 F.3d 408, 413 (3d Cir.2001) (noting that to show that an

evidentiary error rises to the level of a due process violation, a petitioner must show "that it was

of such magnitude as to undermine the fundamental fairness of the entire trial"). The United

States Supreme Court has "defined the category of infractions that violate 'fundamental fairness'

very narrowly." *Dowling v. United States,* 493 U.S. 342, 352, 110 S. Ct. 668, 107 L. Ed. 2d 708

(1990).

As implied by the Appellate Division's discussion, the demonstration was not gratuitous.

It was permitted so that the jurors (who were not necessarily familiar with firearms) could see

and hear the bullets being ejected from the firearm. The demonstration related directly to

relevant issues at trial: for example, Michael Usung's testimony about hearing the clicking of the

gun, and the recovery of two ejected bullets. The state court's evidentiary ruling did not

contravene any United States Supreme Court authority. Nor was it so arbitrary and prejudicial so

as to render Mr. Choi's trial fundamentally unfair. Accordingly, this claim will be denied.

F. <u>Claim VI – Ineffective Assistance of Counsel for Failing to Advise of Right to Testify</u>

In Claim VI, Mr. Choi argues that he received ineffective assistance of counsel when his

trial attorney failed to advise him of his right to testify at a suppression hearing and at trial. The

last reasoned decision on this claim was that of the Appellate Division on appeal from the denial

of PCR:

> A claim that a defendant was denied the effective assistance of
> counsel as guaranteed by the Sixth Amendment to the United
> States Constitution is considered under the test established in
> *Strickland v. Washington,* 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed.
> 2d 674 (1984). In order to prevail on the claim, a defendant first
> must show that his attorney's handling of the matter "fell below an
> objective standard of reasonableness." *Id.* at 687–88, 104 S. Ct. at
> 2064, 80 L. Ed. 2d at 693. A defendant also must show that there
> exists a "reasonable probability that, but for counsel's
> unprofessional errors, the result of the proceeding would have been
> different." *Id.* at 694, 104 S. Ct. at 2068, 80 L. Ed. 2d at 698. Our
> Supreme Court has adopted this test for evaluating ineffective-
> assistance-of-counsel claims raised under our State Constitution.
> *State v. Fritz,* 105 N.J. 42, 58 (1987).
>
> Here, defendant argues that his trial attorney was deficient because
> he failed to advise him of his right to testify during the suppression
> hearing, as well as during the trial. We disagree. The record shows
> that at the suppression hearing, defendant's attorney stated that,
> with the assistance of an interpreter, he had discussed with
> defendant whether he would testify. Counsel informed the court
> that defendant had decided he would "rather rely" on the legal
> arguments that counsel would make, based on the record that the
> State had presented.
>
> The record also shows that during the trial, the court asked
> defendant whether he wished to testify, and counsel informed the
> court that he had discussed the matter with defendant and
> defendant had chosen not to testify. Defendant said that this was
> correct. Moreover, defendant and counsel completed a waiver
> form, in which counsel stated that he had advised his client of his
> right not to testify and his right to have the court "so inform the
> jury." In addition, the court reviewed the jury charge with
> defendant, which states that defendant has the right to testify but is
> not required to do so. Thus, the record establishes that defendant's

> attorney advised defendant of his right to testify at the suppression
> hearing and at trial, and defendant elected not to do so.

(Dkt. No. 10-8 at p. 8-10.)

In *Strickland v. Washington,* 466 U.S. 668 (1984), the Supreme Court articulated the test for demonstrating an ineffective assistance of counsel claim. It has two parts.

First, the petitioner must show that counsel's performance fell below an objective standard of reasonableness. *See id.* at 688; *see also Ross v. Varano,* 712 F.3d 784, 798 (3d Cir. 2013). To do so, the petitioner must identify particular acts or omissions that were not the result of reasonable professional judgment. *See Strickland,* 466 U.S. at 690. The federal court must determine whether, in light of all of the circumstances, the identified acts or omissions fell outside the wide range of professional competent assistance. *See id.*

Second, the petitioner must affirmatively demonstrate prejudice. "Prejudice" means that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *See id.* at 694; *see also McBride v. Superintendent, SCI Houtzdale,* 687 F.3d 92, 102 n.11 (3d Cir. 2012). "With respect to the sequence of the two prongs, the *Strickland* Court held that 'a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.... If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.'" *Rainey v. Varner,* 603 F.3d 189, 201 (3d Cir. 2010) (quoting *Strickland,* 466 U.S. at 697).

Finally, on habeas review, it is not enough that a federal judge would have found counsel ineffective. The judge must find that the state court's resolution of the issue was unreasonable, a higher standard:

> The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an *unreasonable* application of federal law is different from an *incorrect* application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Harrington,* 562 U.S. at 101 (internal quotation marks and citation omitted; emphasis in original).

The state court correctly articulated the *Strickland* standard and reasonably applied it to the facts of Mr. Choi's case. This is far from a silent record. During the suppression hearing, defense counsel stated on the record that he had, with the assistance of an interpreter, discussed with Mr. Choi whether he would like to testify. (*See* Dkt. No. 10-12 at p. 2.) Counsel represented that Choi had "decided he would rather rely on the legal arguments [counsel was] going to make based on the evidence the State presented." (*Id.*) The only evidence of record, then, indicates that counsel informed Mr. Choi of his right to testify at the suppression hearing, and that Choi decided not to do so. The state court was entitled to treat those binding, on-the-record representations as dispositive.

As for Mr. Choi's right to testify at trial, the record discloses the following. After the prosecution finished its case, the following colloquy took place between the Court; Brian J. Neary, Esq. and F. Jon Iannaccone, Esq., who were Mr. Choi's trial counsel; and Mr. Choi himself:

> THE COURT: Mr. Neary, what is defense going to do? Is he going to testify or not? I gave the form earlier to Mr. Iannaccone.

MR. IANNACCONE:  We've discussed this with Mr. Choi. It is Mr. Choi's decision not to testify. Is that correct, Mr. Choi?

THE DEFENDANT:  Yes.

THE COURT:  He answered in English.

THE COURT:  All right. Mr. Neary, did you fill out the form?

MR. NEARY:  Mr. Iannaccone is doing it right now.

THE COURT:  It doesn't look to me like he's doing it.

MR. NEARY:  He's talking to the client.

THE COURT:  I thought he did it before. You said he went over it already.

MR. NEARY:  The interpreter can only do one thing at a time.

THE COURT:  Mr. Iannaccone, you reviewed the defendant's election not to testify with Mr. Choi. What has he chosen to do?

MR. IANNACCONE:  Mr. Choi has chosen not to testify. And he's also – we've reviewed the form together. It is Mr. Choi's decision to have the instruction given to the jury regarding not testifying. We do wish to have the instruction given and have the form signed by Mr. Choi and myself.

THE COURT:  Mr. Choi, you just heard the comments made by Mr. Iannaccone. I'm going to read a form to you again. It says, "The defendant in this case, Jin Sig Choi, chose not to be a witness. It is the constitutional right of a defendant to remain silent. That should not in any way be held against him. I charge you that you are not to consider for any purpose or in any manner in arriving at your verdict the fact that the defendant did not testify, nor should that fact enter into your deliberations or discussions in any manner or at anytime. The defendant is entitled to have the jury consider all of the evidence, and he is entitled to the presumption of innocence even if he does not testify as a witness." Then there is a paragraph that says I, Jin Sig Choi, understand that I have the right to have the above charge given to the jury." Then it says choose one or two. One says, "I have elected to have this charge given to the jury." And it says defendant's signature. And there is a signature on that line.

Is this the form you just signed, Mr. Choi.

THE DEFENDANT:  Yes.

THE COURT:  Is that your signature?

THE DEFENDANT:  Yes.

THE COURT:  Thank you, Mr. Choi. And then also, Mr. Iannaccone, it also says, "I hereby certify that I have advised my client of his right not to testify and his right to have the Court so inform the jury." This is your signature, Mr. Iannaccone?

MR. IANNACCONE:  It is.

THE COURT:  You want me to read this charge to the jury then?

35

> MR. IANNACCONE:  Yes. I do wish you to read that charge to
> the jury. I did discuss with Mr. Choi his decision not to testify.
> This was done with the aid of an interpreter at the jail.
> THE COURT: Thank you very much.

(Dkt. No. 10-20 at p. 46-48.)

As the above colloquy discloses, Mr. Choi was informed of his right to testify, both orally

and in writing via a court form. Counsel in open court acknowledged his signature on the form,

which stated that he had advised Choi of his rights. Mr. Choi himself represented that he chose

not to testify, orally in open court. He did the same in writing, by signing the form. The state

court was entitled to credit these binding representations.

The state court did not unreasonably apply the standards of *Strickland* or unreasonably

find the facts when it found, based on the transcript, that counsel fully informed Mr. Choi of his

right to testify and that Choi freely chose not to do so. Mr. Choi has failed to show that he is

entitled to federal habeas relief on his claim that counsel was ineffective for failing to advise him

of his right to testify.

G.  <u>Claim VII – Ineffective Assistance of Counsel for Failing to Challenge State's
    Translation of a Korean-Language Letter Written by Choi</u>

In Claim VII, Mr. Choi asserts that his trial counsel was ineffective because he failed to

challenge the state's translation of one word in a Korean-language letter that Choi wrote to Mr.

Park. Choi's letter describes Chang's purchase of a gun from Park. According to the state's

English translation of the letter, Mr. Choi wrote that he "tested" the gun. According to Choi, the

proper translation is that he "touched" the gun:

> By translating the sentence at issue as "I tested the gun with my
> hand," rather than "I touched the gun with my hand," the
> interpreter conveyed to the jury the idea that Mr. Choi was familiar
> with guns, and expert enough to know how to test one. This could
> have enhanced the prosecution's efforts to portray Mr. Choi as a

dangerous and violent man, who was an active participa[nt] in the
crimes which occurred.

(Dkt. No. 1 at p. 21.)

The last reasoned decision on this claim comes from the Appellate Division on appeal

from the denial of PCR:

> Defendant also argues that his trial attorney was deficient because
> he failed to retain an expert in the Korean language to challenge
> the translation by the State's expert witness of a letter that
> defendant wrote to Park. Defendant claims that the State's expert
> incorrectly translated the letter as stating that he had "tested" the
> weapon that Park sold to him and Jang. According to defendant,
> the letter stated that he had only "touched" the weapon. In support
> of this argument, defendant presented a certification from an
> investigator in the Office of the Public Defender, who asserted that
> he is fluent in the Korean language.
>
> The PCR court correctly found no merit in this argument. The
> mere fact that the letter may have been subject to different
> interpretations does not mean that a jury would have accepted the
> interpretation offered by defendant. Moreover, the evidence was
> not material to the case. The State had presented the letter to show
> that defendant was present when the gun used in the robbery was
> purchased. Defendant admitted that fact when he gave his
> statement to the investigators. Whether he tested the gun or merely
> touched it had little bearing on whether he was, in fact, guilty of
> the charged offenses, given the extensive evidence presented
> concerning his involvement in the events of January 4, 1995.

(Dkt. No. 10-8 at pp. 10-11.)

The state court's denial of this claim was not an unreasonable application of *Strickland* or

an unreasonable determination of the facts. Most pertinently, changing "tested" to "touched"

could not have changed the outcome of this case. The letter was properly admitted in evidence to

show that Mr. Choi was present when the gun was purchased. As noted by the Superior Court

during the PCR proceedings, there was plenty of other evidence linking Choi to the crimes

themselves: for example, Choi's admissions to the police that he had discussions with the co-

defendants, that he drove the car to pick up the co-defendants, that he knew they were armed, and that he knew they intended to rob someone. Mr. Choi's DNA was also found on a cigarette near the crime scene.

The mistranslation of this single word, even if it could be proven, could not have influenced the verdict. Accordingly, Mr. Choi fails to show that he is entitled to federal habeas relief on this claim.

H. <u>Claims VIII and IX – PCR Court Erred in Failing to Conduct Evidentiary Hearing Before Deciding Claims VI and VII</u>

In Claim VIII, Mr. Choi argues that the PCR Court should have conducted an evidentiary hearing on his claim (Claim VI) that trial counsel was ineffective for failing to advise him of his right to testify at the suppression hearing and at trial. In Claim IX, Mr. Choi asserts that the PCR court should have conducted an evidentiary hearing on his claim (Claim VII) that trial counsel was ineffective for failing to retain an expert to rebut the State's translation of the letter written by him. The merits of the underlying ineffective assistance claims have already been discussed at Parts IV.F and IV.G, *supra*. Here, I discuss only the alleged entitlement to an evidentiary hearing.

In general, "the federal role in reviewing an application for habeas corpus is limited to evaluating what occurred in the state or federal proceedings that actually led to the petitioner's conviction; what occurred in the petitioner's *collateral* proceeding does not enter into the habeas calculation." *Hassine v. Zimmerman*, 160 F.3d 941, 954 (3d Cir. 1998); *see also Lambert v. Blackwell*, 387 F.3d 210, 247 (3d Cir. 2004) ("[H]abeas proceedings are not the appropriate forum for Lambert to pursue claims of error at the PCRA proceeding."). Thus a prisoner's claim that the PCR court should have conducted an evidentiary hearing would not necessarily be cognizable as a habeas claim at all. *Accord Davis v. New Jersey*, No. 12-5748, 2014 WL

2615657, at *17 (D.N.J. June 12, 2014) (petitioner fails to state a cognizable claim under section 2254 where he argues that PCR court erred in failing to conduct an evidentiary hearing); *Vreeland v. Warren*, No. 11-5239, 2013 WL 1867043, at *4 n.2 (D.N.J. May 2, 2013).

Ineffective assistance of counsel, however, is *sui generis*. In many states—New Jersey is one—ineffective assistance claims are almost always raised in post-conviction proceedings, not on direct appeal. *State v. Preciose*, 129 N.J. 451, 459-61, 609 A.2d 1280, 1284-85 (1992); *see generally* N.J. Ct. R. 3:22-2, 3:22-4.[7] As to ineffective assistance claims, PCR is not a second, redundant stage of review; it is ordinarily the prisoner's one and only opportunity to pursue the claim. That tips the equities. *Cf. Martinez v. Ryan,* — U.S.—, 132 S.Ct. 1309 (2012) (where state procedures dictate that claims of ineffective assistance be brought in post-conviction proceedings, ineffective assistance of post-conviction counsel may constitute "cause" for procedural default); *Trevino v. Thaler*, — U.S.—, 133 S.Ct. 1911  (2013) (rule in *Martinez* applies, not only in states that categorically bar ineffective assistance claims on direct appeal, but also in states where it is "virtually impossible," as a practical matter, to pursue such claims before the collateral review stage). By considering an ineffective assistance claim asserted in PCR proceedings, the habeas court does not multiply proceedings or shift the focus from direct appeal; it merely ensures that the prisoner's ineffective assistance claim receives one round of review. *Cf. Cox v. Horn*, 757 F.3d 113, 121-22 (3d Cir. 2014) (rule in *Martinez* was "crafted … to ensure that fundamental constitutional claims receive review by at least one court").

---

[7]     Almost always, but not always. In rare cases, the trial record may furnish a sufficient basis for consideration of an ineffective assistance claim on direct appeal. If so, full litigation of the ineffective assistance claim on direct appeal may bar its consideration in later PCR proceedings. *See State v. McQuaid*, 147 N.J. 464, 483-84, 688 A.2d 584, 594-95 (1997). Most commonly, however, a defendant who attempts to raise an ineffective assistance claim on direct appeal will be directed to pursue the claim in PCR proceedings. *See, e.g., State v. Cortez-Morale*, 2015 WL 3648727, at *4 (N.J. Super. Ct. App. Div. 2015); *State v. Cawley*, 2015 WL 1540683, at *9 (N.J. Super. Ct. App. Div. 2015).

The evidentiary-hearing claims are bound up with the merits of the ineffective assistance claims. I will therefore consider whether the state court's denial of an evidentiary hearing on Claims VI and VII entitles Mr. Choi to habeas relief. That issue is easily disposed of.

Claim VI (that trial counsel was ineffective for failing to advise Mr Choi of his right to testify) did not require an evidentiary hearing. Counsel's advice to Mr. Choi, the Court's advice to Choi, and Choi's decision not to testify, appear on the face of the transcript. In addition, at trial Choi and his counsel signed a court form to the same effect. That record does not pose any significant issue of fact requiring an evidentiary hearing. *See* Part IV.F, *supra*.

Claim VII (that trial counsel was ineffective for failing to retain an expert to rebut the State's translation of Choi's letter) likewise did not require an evidentiary hearing. As I found above, we may assume *arguendo* that the translation proffered by Choi is correct. Nevertheless, the difference between Choi's "testing" and "touching" the gun could not conceivably have affected the outcome. The purpose of the letter was to establish Choi's presence when the gun was purchased; his involvement in the crime itself amply established by other evidence. Because Choi is not entitled to relief even on his interpretation of the letter, no evidentiary hearing was necessary. *A fortiori,* the state court, acting within its discretion, could permissibly have thought so. *See* Part IV.G, *supra*.

Accordingly, Mr. Choi is not entitled to federal habeas relief on this claims that the PCR court should have conducted an evidentiary hearing on two ineffective assistance claims. Claims VIII and IX will be denied.

I.   Claim X – New Jersey Rule 3:22-4 and 3:22-5 did not Preclude Trial Court From Adjudicating Issues in PCR Petition

In Claim X, Mr. Choi argues that New Jersey Court Rules 3:22-4 and 3:22-5 did not preclude the PCR court from adjudicating the merits of the issues he raised in his PCR petition.

Because the PCR court *did* adjudicate the merits of those claims, I find that this contention,

whatever its abstract merits, does not furnish a basis for federal habeas relief.

Rule 3:22-4 states as follows:

> (a) First Petition for Post-Conviction Relief. Any ground for relief
> not raised in the proceedings resulting in the conviction, or in a
> post-conviction proceeding brought and decided prior to the
> adoption of this rule, or in any appeal taken in any such
> proceedings is barred from assertion in a proceeding under this rule
> unless the court on motion or at the hearing finds:
> (1) that the ground for relief not previously asserted could not
> reasonably have been raised in any prior proceeding; or
> (2) that enforcement of the bar to preclude claims, including one
> for ineffective assistance of counsel, would result in fundamental
> injustice; or
> (3) that denial of relief would be contrary to a new rule of
> constitutional law under either the Constitution of the United
> States or the State of New Jersey.
> A ground could not reasonably have been raised in a prior
> proceeding only if defendant shows that the factual predicate for
> that ground could not have been discovered earlier through the
> exercise of reasonable diligence.
> A denial of relief would be contrary to a new rule of constitutional
> law only if the defendant shows that the claim relies on a new rule
> of constitutional law, made retroactive to defendant's petition by
> the United States Supreme Court or the Supreme Court of New
> Jersey, that was unavailable during the pendency of any prior
> proceedings.

N.J. Ct. R. 3:22-4.

Rule 3:22-5 states as follows:

> A prior adjudication upon the merits of any ground for relief is
> conclusive whether made in the proceedings resulting in the
> conviction or in any post-conviction proceeding brought pursuant
> to this rule or prior to the adoption thereof, or in any appeal taken
> from such proceedings.

N.J. Ct. R. 3:22-5.

On appeal to the Appellate Division from the denial of his PCR petition, Mr. Choi argued

these two court rules did not bar him from litigating his two ineffective assistance of counsel

claims (Claims VI and VII in this petition) in PCR proceedings, because they could not have been raised on direct appeal. (*See* Dkt. No. 10-6 at p. 37-39.) And of course it is true that, in general, New Jersey procedure dictates that claims of ineffective assistance of counsel ordinarily be asserted in PCR proceedings. *See State v. Preciose, supra.* As established above, however, the state court *did* consider Claims VI and VII. It denied those claims, but it denied them on the merits, not on grounds of default. As to Claim X, then, Mr. Choi does not set forth any plausible assertion that his rights under the Constitution, laws or treaties of the United States were violated.  Claim X is therefore denied.

J.  Certificate of Appealability

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). I find that this standard is not met, and I will not order the issuance of a certificate of appealability.

## V.    CONCLUSION

For the foregoing reasons, Mr. Choi's habeas petition will be denied. A certificate of appealability will not issue. An appropriate order will be entered.

Dated: June 30, 2015

KEVIN MCNULTY
United States District Judge